IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 21-0613

_____

**FILED**

**April 24, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

L&D INVESTMENTS, INC., a West Virginia corporation,
RICHARD SNOWDEN ANDREWS, JR.,
MARION A. YOUNG TRUST,
CHARLES A. YOUNG, DAVID L. YOUNG, and
LAVINIA YOUNG DAVIS, Successors of Marion A. Young Trust,
CHARLES LEE ANDREWS, IV, and
FRANCES L. ANDREWS
Plaintiffs Below, Petitioners,

v.

ANTERO RESOURCES CORPORATION, and
MIKE ROSS, INC.,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Harrison County
The Honorable Thomas A. Bedell, Judge
Civil Action No. 13-C-528-2

REVERSED AND REMANDED
WITH INSTRUCTIONS

_____

Submitted: February 7, 2023
Filed: April 24, 2023

David J. Romano, Esq.
Romano Law Office, LC
Clarksburg, West Virginia
Counsel for Petitioners

Michael Jacks, Esq.
Jacks Legal Group, P.L.L.C.
Morgantown, West Virginia
Guardian ad Litem for Respondent
Unknown Heirs

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE BUNN deemed herself disqualified and did not participate in the decision.

JUDGE MICHAEL J. OLEJASZ sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1.        "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *Bayer MaterialScience, LLC v. State Tax Comm'r*, 223 W. Va. 38, 672 S.E.2d 174 (2008).

2.        "Where a fund is brought into a court of equity through the services of an attorney, who looks to that alone for his compensation, although his interest cannot technically be called a 'lien,' he is regarded as the equitable owner of the fund, to the extent of the reasonable value of his services; and the court administering the fund will intervene for his protection, and award him a reasonable compensation, to be paid out of it." Syl. Pt. 8, *Weigand v. All. Supply Co*., 44 W. Va. 133, 28 S.E. 803 (1897).

3.        This Court adopts the persuasive authority of the Restatement (Third) of Restitution and Unjust Enrichment § 29 (Am. Law Inst. 2022), in its entirety, as the law of this State:

> (1) As the terms are used in this section, a "common fund" consists of money or other property in which two or more persons (the "beneficiaries") are entitled to share by reason of their common or parallel interests therein. A "claimant" is a beneficiary, or a person acting by agreement on behalf of a beneficiary, who succeeds in creating, preserving, or enlarging a common fund by asserting the legal rights of a beneficiary.

(2) A claimant may require those beneficiaries for whom the claimant is not acting by agreement to contribute to the reasonable and necessary expense of securing the common fund for their benefit, in proportion to their respective interests therein, as necessary to prevent unjust enrichment.

(3) A beneficiary is liable in restitution only if:

(a) Liability will not oblige the beneficiary to make a net payment in cash;

(b) The measurable value added to the beneficiary's interest in the common fund by the claimant's intervention exceeds the beneficiary's liability to the claimant;

(c) The claimant has neither acted gratuitously nor received full compensation from others; and

(d) Liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.

(4) Liability in restitution may be reduced or eliminated if the court finds that the person from whom restitution is sought has made a valuable contribution to the transaction by which the common fund is created, preserved, or enlarged.

**WOOTON, Justice:**

The underlying lawsuit, a quiet title action and concomitant claim for unpaid oil and gas royalties, ultimately resulted in two separate monetary settlements, one for the benefit of the named plaintiff/petitioners, and one for the benefit of a separate group of individuals ("the Unknown Heirs") whose interests are wholly aligned with petitioners' interests but with whom petitioners' counsel ("Counsel") has never been able to establish contact. This appeal presents a single, straightforward issue: under the facts and circumstances of this case, is Counsel entitled to payment of an attorney fee and costs from the separate settlement fund he negotiated on behalf of the Unknown Heirs, despite the fact that he has no contractual relationship with them?

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable law, we conclude that the circuit court erred by denying Counsel's request for an attorney fee and costs pursuant to the common fund doctrine. We reverse the judgment of the circuit court and remand this case for determination of a reasonable attorney fee and costs to be paid to Counsel from the settlement he negotiated on behalf of the Unknown Heirs.

## I.    Facts and Procedural Background

1

The underlying lawsuit was initially filed in 2013 on behalf of petitioner L&D Investments, Inc. against respondent Antero Resources Corporation.[1] The property at issue ("the Andrews Tract") consisted of two adjacent tracts of land totaling approximately 1,041 acres located on "Middle Fork of Sycamore Creek in the Union District of Harrison County," from which the oil and gas interests had been severed from the surface and coal interests in 1903. While this hard-fought case was ongoing, it generated three appeals to this Court: *L & D Investments, Inc. v. Mike Ross, Inc.*, 241 W. Va. 46, 818 S.E.2d 872 (2018) and *Antero Resources Corp. v. L&D Investments, Inc.*, Nos. 20-0964 & 20-0967, 2022 WL 1222944 (W. Va. Apr. 26, 2022) (memorandum decision).[2]

As detailed in *L&D Investments*, Charles Lee Andrews, who owned the subject property in fee simple as trustee for his mother, Mary Catherine Lee Andrews ("Mrs. Andrews"), conveyed the surface and coal interests in 1903 while excepting and reserving the oil and gas interests from the conveyance. Thereafter, when Mrs. Andrews died in 1920, the oil and gas interests were divided among her four children, who each received a twenty percent share, and the three children of her deceased daughter, who received equal shares of the remaining twenty percent. All of the petitioners herein are

---

[1] Subsequently, respondent Mike Ross, Inc. was added as an additional defendant.

[2] The underlying case has now been settled, and because the issue currently before the Court does not in any way affect the respondents' interests or rights, they have not appeared in this appeal. *See* text *infra*.

heirs of one or more of Mrs. Andrews' descendants, or, in the case of L&D Investments, Inc., devisees of one or more of those heirs.

Through his diligent investigative efforts in the early stages of the litigation, Counsel was able to identify all of the descendants and heirs of Mrs. Andrews and, where applicable, their devisees. Because this was a quiet title action affecting the rights of all these individuals and/or entities, Counsel filed an Amended Complaint making them all parties defendant and thereafter made multiple attempts to give them all notice of the pendency of the suit. As a result of Counsel's efforts, the petitioners herein were located and agreed to be represented by Romano Law Office, LC.; however, Counsel was never able to locate and/or establish contact with the individuals designated herein as the Unknown Heirs.

Of specific relevance to the issue raised in this appeal, two facts are key. First, none of the Unknown Heirs have refused to participate in the lawsuit or refused to be represented by Counsel; rather, the simple fact is that Counsel has never been able to establish contact with them despite multiple attempts to give them notice of the suit and ascertain their wishes. Second, although Counsel was not able to establish contact with the Unknown Heirs, he was able to identify all of them, to establish their respective ownership interests in the oil and gas rights to the Andrews Tract, and to establish the percentage of

3

royalties to which each was entitled by virtue of the respondents' extraction of oil and gas both in the past and in the future.

As noted *supra*, the quiet title action was protracted. Ultimately, however, the petitioners were successful in establishing their ownership of the oil and gas rights in the Andrews Tract and thus their right to past, present, and future royalties based on their respective ownership percentages. In addition to negotiating a settlement for his clients, Counsel also negotiated a separate settlement for the Unknown Heirs: having established their individual percentage ownership interests in the oil and gas rights in the Andrews Tract, which altogether totaled 13.7777%, Counsel negotiated a settlement for them in the amount of $2,229,526.72 for unpaid royalties, with future royalties to be regularly paid into the settlement fund.

Because he had settled the case not only for his clients but also for the Unknown Heirs, Counsel filed a motion to hold the Unknown Heirs' settlement fund in the firm's IOLTA[3] account pending further efforts to contact these individuals and distribute the funds. The circuit court denied the motion on the ground that Counsel

---

[3]"'IOLTA' is an acronym for Interest on Lawyer Trust Accounts. An IOLTA account for the safekeeping of client funds that are 'expected to be held for a brief period' is addressed under Rule 1.15. of the *West Virginia Rules of Professional Conduct.*" *Law. Disciplinary Bd. v. Haught*, 233 W. Va. 185, 188 n.3, 757 S.E.2d 609, 612 n.3 (2014) (citation omitted).

> has not demonstrated any legal standing upon which he should be allowed to represent or otherwise elicit further Court proceedings, as a fiduciary, on behalf of any Unknown Heirs' interests as such parties are named [d]efendants herein. There has been no showing of any attorney-client or fiduciary relationship between [petitioners'] legal counsel and the Unknown Heirs herein.

Accordingly, the settlement fund was paid into the Court Registry, and Counsel has not appealed from this decision.

Counsel also filed a motion to require the payment of prejudgment interest to the Unknown Heirs. The circuit court denied this motion as well, finding that Counsel "does not represent the Unknown Heirs as an attorney or fiduciary," and therefore "lacks the authority to file a motion on behalf of the Unknown Heirs in this Case." The court then sua sponte appointed a guardian ad litem ("the GAL") to represent the interests of the Unknown Heirs. The GAL's subsequent attempt to recover prejudgment interest for them was unsuccessful, and the court's denial of relief was not appealed.

Finally, on March 12, 2021, Counsel filed his "Plaintiffs' Request for Attorney's Fees and Costs Under the Common Fund Doctrine," seeking an award of attorney fees (a percentage fee of one-third) and proportionate litigation expenses (in the

amount of $15,942.56) to be paid from the settlement fund which Counsel had negotiated

for the benefit of the Unknown Heirs. Specifically, Counsel argued that

> [t]hese recovered funds are now available to the "Unknown Heirs" due to Plaintiffs' counsel's efforts expended during the more than 7 years of hard fought and risky litigation in this matter which is still ongoing due to a second appeal[4] . . . [and] . . . is premised on the equitable principle of the Common Fund Doctrine.

The circuit court, although expressing sympathy with Counsel's description of himself as

"General Custer without soldiers backing him up" during the course of the lengthy

litigation, denied relief on the ground that a "contract, expressed or implied, is essential to

the right of an attorney to recover compensation from one for whose benefit the attorney

claims to have rendered legal services." Syl. Pt. 2, in part, *Second Nat'l Bank & Tr. Co. v.*

*Willim* (*Willim II*),[5] 155 W. Va. 1, 180 S.E.2d 46 (1971). The court further found that

United States Supreme Court authorities cited by Counsel were inapposite in that those

cases[6] all involved class actions or suits dealing with trust fund commonality. The court

---

[4] At the time the motion was filed, the consolidated appeals in *Antero Resources Corp.* were still ongoing.

[5] In their respective briefs, Counsel and the GAL both refer to *Willim I* [*Security National Bank & Trust Co. v. Willim*, 153 W. Va. 299, 168 S.E.2d 555 (1969)] and *Willim II*, and this Court will do so as well; however, we note that these are actually the third and fourth opinions generated by this Court during the course of a protracted will contest.

[6] *Internal Improvement Fund Trs. v. Greenough*, 105 U.S. 527 (1881); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Hall v. Cole*, 412 U.S. 1 (1973); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). These authorities are discussed *infra*, in greater detail.

concluded that "[s]imply stated, this Court finds and concludes this instant litigation is not a 'common fund case' or otherwise sufficiently suited for exercising its equitable authority as might be applied to the instant circumstances herein[.]"

In light of the fact that the lawsuit was still ongoing, *see supra* note 4, the court directed that its order "be and is a final Order upon an express determination that there is no just reason for delay[.]" *See* W. Va. R. Civ. P. 54(b).[7] This appeal followed.

## II. Standard of Review

In the instant case we are presented first with an issue of law: whether the "common fund doctrine" applies in any context other than class action suits, bankruptcies, or matters of trust fund commonality. In that regard it is well established that "'[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *Bayer*

---

[7] Rule 54(b) of the West Virginia Rules of Civil Procedure provides, in relevant part:

> *Judgment upon multiple claims or involving multiple parties.* – When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

*MaterialScience, LLC v. State Tax Comm'r*, 223 W. Va. 38, 672 S.E.2d 174 (2008). The subsidiary issue, whether the Unknown Heirs' settlement fund falls within the "common fund doctrine" under the doctrine's contours as established by this Court, is a mixed question of law and fact. Therefore the "circuit court's factual findings should be reviewed under a clearly erroneous standard and . . . questions of law are subject to *de novo* review." *State v. Black*, 227 W. Va. 297, 311, 708 S.E.2d 491, 505 (2010) (citations omitted).

### III. Discussion

To resolve the issue presented herein, this Court must blow the dust off some very old volumes of the West Virginia Reports in order to determine whether our precedents – many of them from the nineteenth century – are at odds with modern jurisprudence as to the contours of the common fund doctrine.

We begin with a brief overview of relevant authority from the United States Supreme Court, as "[that] Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478. Indeed, one is hard-pressed to find a common fund case from any jurisdiction, federal or state, that does not reference some or all of the Supreme Court authorities which the circuit court wholly discounted as inapposite to this case. *See supra* note 6. The Supreme Court itself cited all six of them as authority in a recent case, *US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013), stating that "[t]his Court has 'recognized consistently' that someone 'who

recovers a common fund for the benefit of persons other than himself' is due 'a reasonable attorney's fee from the fund as whole[,]" [and s]tate courts have done the same; the 'overwhelming majority' routinely use the common-fund rule to allocate the costs of third-party recoveries between insurers and beneficiaries." 569 U.S. at 104 (citations omitted).

In *Greenough*, suit was brought by a bondholder of Florida Railroad Company on behalf of himself and other bondholders against the Trustees of the Internal Improvement Fund of Florida ("the Trustees"), whose oversight and management of millions of acres of state land was intended to establish and maintain a fund for the purpose of paying interest accruing on the bonds and installments of the sinking fund for meeting the principal. 105 U.S. at 528-29. The bondholders, alleging that the Trustees were wasting and destroying the fund by selling the land at nominal prices, to the detriment of the bondholders, sought to have the conveyances set aside and a receiver appointed to oversee the fund. *Id*.

The bondholders were largely successful in their lawsuit, and the receivers and agents appointed by the court were able to maximize the fund for the benefit of all of the bondholders. At that point, the named plaintiff in the suit, Francis Vose, who had paid all of the fees and costs incurred in pursuing the litigation, sought to have his fees and costs reimbursed from the fund so that all of the bondholders would be, in effect, sharing equally in those fees and costs. *Id*. at 529. The question arose as to whether the expenses of a litigant – not a trustee or receiver or agent of the court – could be reimbursed from the fund.

9

The Supreme Court held that so long as the expenses were litigation costs, as opposed to personal costs, they could be recovered because

> where all this [pursuing the litigation] has been done; and done at great expense and trouble on the part of the complainant; and the other bondholders have come in and participated in the benefits resulting from his proceedings,– if the complainant is not a trustee, he has at least acted the part of a trustee in relation to the common interest. He may be said to have saved the fund for the *cestuis que trust*, and to have secured its proper application to their use.

*Id*. at 532; *see also Cent. R.R.*, 113 U.S. at 126 ("The creditors who are entitled to the benefit of the decree had only to await its execution in order to receive the full amount of their claims; and that result was due to the skill and vigilance of the appellees, so far as the result of litigation may, in any case, be referred to the labors of counsel.").

In *Sprague*, the question before the Supreme Court was whether the district court had the authority to allow litigation expenses to be paid from a fund that would benefit not only the plaintiff, who had sued only on her own behalf to impose a lien against certain bonds held by the receiver of a failed bank, but also fourteen other similarly-situated individuals whose entitlement to share in the fund was secured by the plaintiff's victory. 307 U.S. at 163-64. In finding that the district court did indeed have such power, the Supreme Court explored the equitable origin and rationale of the common fund doctrine:

> Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed

10

class suit or the creation of a fund, as it were, through stare decisis rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility.

*Id.* at 167.

In *Mills*, minority shareholders sought to overturn a merger on the ground that the merger was accomplished through the use of a proxy statement that was materially false or misleading. 396 U.S. at 377. In discussing the question of whether the petitioner shareholders, who had established the inadequacy of the proxy statement, were entitled to an interim award of attorney fees and expenses in the absence of any final award of equitable or monetary relief,[8] the Supreme Court noted that

[o]ther cases have departed further from the traditional metes and bounds of the [common fund] doctrine, to permit reimbursement in cases where the litigation has conferred a *substantial benefit* on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.

---

[8] The Court in *Mills* held that the issue of whether to affirm the merger notwithstanding the inadequacy of the proxy statement was one for the trial court to determine; and that whether to award any monetary relief to the petitioner shareholders was also one for the trial court to determine. 396 U.S. at 386-87.

11

*Id.* at 393-94 (emphasis added). Subsequently, in *Hall*, the plaintiff filed suit pursuant to the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"),[9] to contest his expulsion from the Seafarers International Union of North America ("the union") for criticizing certain actions and policies of the union. In reviewing the plaintiff's subsequent request for reimbursement of fees and expenses from the union, the Supreme Court relied heavily on the quoted rationale of *Mills*, first noting that "there can be no doubt that, by vindicating his own right of free speech guaranteed by s 101(a)(2) of Title I of the LMRDA, respondent necessarily rendered a *substantial service* to his union as an institution and to all of its members." *Hall*, 412 U.S. at 8 (emphasis added). Thus, the Supreme Court concluded, "as in *Mills*, reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefited from them and that would have had to pay them had it brought the suit.'" *Id.* at 8-9 (citation and footnote omitted).

Finally, in *Boeing*, a class action suit, defendant/appellant Boeing raised only one issue on appeal: whether an award of fees and costs to plaintiff/appellees' counsel should be limited to that portion of the judgment fund that was actually claimed by class members. 444 U.S. at 477. In this regard, Boeing made two arguments: first, that the equitable underpinnings of the common fund doctrine made its application inapposite in the case "because the money in the judgment fund would not benefit those class members

---

[9] See 29 U.S.C.A. §§ 401 to -531 (2018).

who failed to claim it[,]" and second, because Boeing had a colorable claim for the return of any unclaimed money. *Id.*

The Supreme Court disagreed, first explaining the three factors to be considered in determining whether the common fund doctrine is properly applied in a particular case: "First, the classes of persons benefited by the lawsuits 'were small in number and easily identifiable.' Second, '[t]he benefits could be traced with some accuracy. . . .' Finally, 'there was reason for confidence that the costs [of litigation] could indeed be shifted with some exactitude to those benefiting.'" *Id*. at 478-79 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 265 n.39 (1975). In a case wherein these criteria are met, the Supreme Court explained,

> [o]nce the class representatives have established the defendant's liability and the total amount of damages, members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment fund. This benefit devolves with certainty upon the identifiable persons whom the court has certified as members of the class. Although the full value of the benefit to each absentee member cannot be determined until he presents his claim, *a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of his claim bears to the total recovery*.

*Boeing*, 444 U.S. at 749-50 (emphasis added and citation omitted).

Against the backdrop of these Supreme Court precedents, in which we can see the common fund doctrine established, expanded, and applied in a variety of cases, we turn now to this Court's case law to determine: has this Court adopted a common fund

13

doctrine, and if so, what are its contours? The GAL argues that although the concept of a common fund is found in a number of our cases, to the extent a doctrine can be extrapolated therefrom it is clear that the doctrine implicates only a limited subset of cases, primarily class actions and estate matters. Conversely, Counsel argues that our case law is limited only to the extent that the Court's holdings were narrowly tailored to the facts and circumstances of the cases, and that nothing in the cases prohibits the expansion of common fund principles to a situation where, as here, as a result of an attorney's labor on behalf of his or her clients, others "who are entitled to the benefit of the decree ha[ve] only to await its execution in order to receive the full amount of their claims[.]" *Central R.R.*, 113 U.S. at 126; *see also Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 755 (Alaska 1996) ("The common fund doctrine is implicated any time one litigant's success releases well-defined benefits for a limited and identifiable group of others. Its source is the broad power of a court of equity.") (citing *Alyeska*, 421 U.S. at 257 (1975)).

Our earliest discussions of the concept of a common fund from which attorney fees and costs can be paid are found in suits in equity decided during the nineteenth century. In *Anderson v. Piercy*, 20 W. Va. 282 (1882),[10] we held that the litigation costs incurred

---

[10] The GAL argues that *Anderson*, as well as all cases predating the enactment of the West Virginia Rules of Civil Procedure in 1960, are nothing more than "antiquated common law that has evolved, changed, and become, in large part, controlled by subsequent procedural rules[.]" This Court does not accept the proposition that its pre-1960 precedents are irrelevant to the resolution of post-1960 legal issues. In this regard, we noted in the seminal case of *Morningstar v. Black & Decker Manufacturing Co.*, 162 W. Va. 857, 253 S.E.2d 666 (1979), that

by the executor of an estate "should be paid out of the common fund, that is, by the testator [out of the estate,]" so long as the executor's work was in furtherance of the testator's directives and intentions. *Id*. at 341.[11] This concept was expanded into what may be deemed our first formulation of a doctrine in *Weigand v. Alliance Supply Co*., 44 W. Va. 133, 28 S.E. 803 (1897):

> Where a fund is brought into a court of equity through the services of an attorney, who looks to that alone for his compensation, although his interest cannot technically be called a 'lien,' he is regarded as the equitable owner of the fund, to the extent of the reasonable value of his services; and the court administering the fund will intervene for his

> [t]he chief cause of the success of our common-law doctrine of precedents as a form of law is that it combines certainty and power of growth as no other doctrine has been able to do. Certainty is insured within reasonable limits in that the court proceeds by analogy of rules and doctrines in the traditional system and develops a principle for the cause before it according to a known technique. Growth is insured in that the limits of the principle are not fixed authoritatively once for all but are discovered gradually by a process of inclusion and exclusion as cases arise which bring out its practical workings and prove how far it may be made to do justice in its actual operation.

162 W. Va. at 873, 253 S.E.2d at 675 (citing ROSCOE POUND, THE SPIRIT OF THE COMMON LAW 182 (1921)).

[11] *See generally In re Est. of Rohrich*, 496 N.W.2d 566, 573 (N.D. 1993), where the Supreme Court of North Dakota held that "[w]ithin the meaning of the common fund doctrine, if the beneficiary's action brought about an enhancement in value or an increase in the assets of the estate, the beneficiary may be awarded fees if the facts justify the award."

> protection, and award him a reasonable compensation, to be
> paid out of it.

*Id*. at 134, 28 S.E. at 803, Syl. Pt. 8. In *Weigand*, the issue before this Court (one of many) was whether the trustee and receiver appointed to oversee the dissolution of a business concern were entitled to recover fees and costs from the marshalled assets of the company. *Id*. at 160-61, 28 S.E. at 813. We held that they were, subject to our earlier admonition in *Crumlish's Adm'r v. Shenandoah Val. R. Co.*, 40 W. Va. 627, 22 S.E. 90 (1895), wherein we held in syllabus point eleven, in part, that "expenditures to be allowed a special receiver must be reasonable, and such as are proper, essential, and necessary in the due and ordinary execution of his office, and such as were contemplated in his appointment and according to the nature of his business." *Crumlish's Adm'r*, 40 W. Va. at 628, 22 S.E. at 91, Syl. Pt. 11, in part; *see also* Syl. Pt. 6, *Roach v. Wallins Creek Colleries Co.*, 111 W. Va. 1, 160 S.E. 860 (1931) ("A receiver is entitled to a reasonable compensation for his services. But the allowance should be made with jealous regard for the rights of all concerned.").

Here it should be noted that the circuit court read *Roach* as limiting the common fund doctrine to class action suits, based on syllabus point four of that decision wherein it was stated that

> [e]xcept in rare instances, the power of a court to require
> one party to contribute to the fees of counsel of another party
> must be confined to cases where the plaintiff, suing in behalf
> of himself and others of the same class, discovers or creates a
> fund which enures [sic] to the benefit of all.

16

111 W. Va. at 1, 160 S.E. at 860, Syl. Pt. 4. We disagree that *Roach* controls the disposition of this case, as the fund negotiated by Counsel on behalf of the Unknown Heirs does not in any way benefit the petitioners, and the fund negotiated by Counsel on behalf of the petitioners does not in any way benefit the Unknown Heirs. Simply put, the fees and expenses award sought by Counsel in this case does not in any way implicate fee-shifting; rather, Counsel's labor on behalf of his clients "has conferred a substantial benefit on the [Unknown Heirs]," and an award of fees and costs from the Unknown Heirs' settlement as well as the clients' settlement "will operate to spread the costs proportionately among them." *Mills*, 396 U.S. at 393-94.

In *Willim I*, a post-1960 case relied upon both by Counsel and the GAL – who obviously read the decision differently – this Court held that

> [e]xcept in rare instances, the power of a court to require one party to contribute to the fees of counsel of another party must be confined to cases where the plaintiff, suing in behalf of himself and others of the same class, discovers or creates a fund which enures [sic] to the benefit of all.

*Willim I*, 153 W. Va. at 300, 168 S.E.2d at 556, Syl. Pt. 4 (quoting *Roach*, 111 W.Va. at 1, 160 S.E. at 860, Syl. Pt. 4). Counsel claims that *Willim I* eliminates any doubt that he, having created a fund that benefitted the Unknown Heirs, is entitled to attorney fees and costs to be paid from that fund. On the other hand, the GAL claims that *Willim I*, like *Roach*, firmly establishes the principle that such fees and costs are recoverable only where the plaintiff has instituted a class action. We conclude that both parties give far more weight to *Willim I* than the facts of the case can bear. Although it is fair to say that the decision by

17

necessary inference upholds the notion of the corpus of an estate as a "common fund," that issue was neither litigated nor addressed in the decision. Rather, the question before the Court was whether the executor of the estate was entitled to fees and costs when his or her efforts did not inure to the benefit of all the beneficiaries named in the will. To that point, the Court relied on its previous decision in *Roach*, holding that "[t]he services of an attorney cannot be rewarded by fees paid out of an estate where such attorney has represented litigants who sought to recover funds from an estate in a purely adversary capacity." *Id.* at 300, 168 S.E.2d at 556, Syl. Pt. 3.

In *Willim II*, another case upon which the circuit court relied, this Court held at syllabus point two that

> [w]here an attorney renders legal services in behalf of clients by whom he is employed, the mere fact that such services are beneficial to another party to the case or cases in the court in which such legal services are rendered does not entitle the attorney to recover an attorney fee from the other party who was benefited by the performance of such services. The general rule is that the creation of a relationship of attorney and client by contract, expressed or implied, is essential to the right of an attorney to recover compensation from one for whose benefit the attorney claims to have rendered legal services.

*Willim II*, 155 W. Va. at 1-2, 180 S.E.2d at 47, Syl. Pt. 2. Unmoored from the facts of the case, this syllabus point would seem to support the circuit court's determination that Counsel has no right to recover fees and costs from the fund negotiated on behalf of the

18

Unknown Heirs, since the Unknown Heirs weren't his clients. However, the Court's holding in *Willim II* rested on two critical facts:

> Inasmuch as the record discloses that *Mrs. Rowe deliberately elected not to employ an attorney*, and inasmuch as *the appellees, in the present case, are not asserting a claim against the 'common fund', the trust estate*, the appellees, in essence, appear to be asserting a claim against Mrs. Rowe on the basis of an implied contract to pay the reasonable value of legal services performed in her behalf or for her benefit. Our attention has not been called to any legal authority or precedent for recognizing an implied contract in the circumstances of this case.

*Id*. at 13, 180 S.E.2d at 53 (emphasis added). Thus, *Willim II* would appear to have no application whatsoever to the instant case, where (1) none of the Unknown Heirs refused to employ counsel, and (2) counsel is asserting a claim against a settlement fund established solely for the benefit of the Unknown Heirs,[12] not against any of those heirs individually. Additionally, in this case Counsel does not rely on "the mere fact that [his] services [on behalf of his clients] are beneficial to another party"; rather, he relies on the services he performed specifically for the benefit of the Unknown Heirs, establishing their ownership interests in the property and their percentage interests in the royalties, and negotiating a multi-million-dollar settlement solely for them. *See Willim II*, 155 W. Va. at 1-2, 180 S.E.2d at 47, Syl. Pt. 2, in part.

_____

[12] It should be noted that Counsel is asserting a claim against the fund as it existed at the time of the settlement; Counsel makes no claim of entitlement to fees from the royalties which are added to that fund on a regular basis.

19

The modern approach to common fund questions was succinctly summarized by the Supreme Court of Illinois in *Morris B. Chapman & Associates., Ltd. v. Kitzman*, 739 N.E.2d 1263 (Ill. 2000):

> We consider it well established that the common fund doctrine "has been applied in many types of cases covering a large range of civil litigation," not just to class actions and insurance subrogation cases. *Scholtens* [*v. Schneider,* 671 N.E.2d 657 (Ill. 1996)] (and authorities cited therein);[13] R. Rossi, Attorneys' Fees §§ 6.10 through 6.21 (2d ed. 1995 & Supp. 2000) (discussing many types of cases in which doctrine has been applied). Whether the doctrine applies in a particular case is not determined by a label, but rather by a proper understanding of the doctrine and its limitations. See generally R. Rossi, Attorneys' Fees §§ 6.1 to 6.9 (2d ed. 1995 & Supp. 2000) (explaining doctrine and its limitations).

*Morris B. Chapman*, 739 N.E.2d at 1272; *see also Moro v. State*, 384 P.3d 504, 510 (Or. 2016) ("The common-fund doctrine applies when a plaintiff's 'legal efforts create, discover, increase, or preserve a fund of money to which others also have a claim.' A party who litigates such a case may recover the costs of those legal efforts, including attorney fees, from the created or preserved fund.") (citations omitted)).

This Court agrees with what may be characterized as the *Chapman* court's functional approach to defining the common fund doctrine as it has evolved over time and

---

[13] The *Scholtens* opinion relied on *Sprague, Central R.R.*, and *Greenough* as support for its observation that "[t]he underlying justification for reimbursing attorneys from a common fund, as explained by the United States Supreme Court in three early cases, is that, unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts." *Scholtens*, 671 N.E.2d at 662-63.

setting the parameters for its applications in a particular case. In this regard, Counsel proposes that this Court adopt a similar functional approach as set forth in the Restatement (Third) of Restitution and Unjust Enrichment § 29 (Am. Law Inst. 2022) ("the Restatement"), which provides that

(5) As the terms are used in this section, a "common fund" consists of money or other property in which two or more persons (the "beneficiaries") are entitled to share by reason of their common or parallel interests therein. A "claimant" is a beneficiary, or a person acting by agreement on behalf of a beneficiary, who succeeds in creating, preserving, or enlarging a common fund by asserting the legal rights of a beneficiary.

(6) A claimant may require those beneficiaries for whom the claimant is not acting by agreement to contribute to the reasonable and necessary expense of securing the common fund for their benefit, in proportion to their respective interests therein, as necessary to prevent unjust enrichment.

(7) A beneficiary is liable in restitution only if:

(e) Liability will not oblige the beneficiary to make a net payment in cash;

(f) The measurable value added to the beneficiary's interest in the common fund by the claimant's intervention exceeds the beneficiary's liability to the claimant;

(g) The claimant has neither acted gratuitously nor received full compensation from others; and

(h) Liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.

(8) Liability in restitution may be reduced or eliminated if the court finds that the person from whom restitution is sought has made a valuable contribution to the transaction by which the common fund is created, preserved, or enlarged.

21

Our review of the Restatement formulation convinces us that it is entirely consistent with the equitable principles that underlie application of the common fund doctrine, and further consistent with the doctrine's evolution both in United States Supreme Court precedents and our own, more limited, precedents. The formulation is not anchored to any specific type of case and is not dependent on a contractual relationship. Rather, the common fund doctrine as explicated in the Restatement may be applied in any case where a claimant – here, Counsel – seeks to recover the reasonable and necessary fees and expense incurred in securing or enhancing a common fund, said recovery being in proportion to the beneficiaries' respective interests in the fund, "as necessary to prevent unjust enrichment." *Id*. § 29. Of particular relevance to the instant case,

> [b]ecause the rule may permit a lawyer to obtain a fee from someone who is not a client, recovery on the basis of common fund is frequently categorized as part of the procedural law governing costs of litigation: as an instance of "fee-shifting" and, as such, an exception to the usual "American rule" requiring litigants to bear their own legal expenses. The characterization is misleading, because the expression "fee-shifting" properly describes rules by which a litigant is permitted to shift the expense of litigation to an adversary; while the restitutionary theory of "common fund" authorizes a recovery from one on whom the claimant has conferred a benefit.

*Id*. § 29 cmt. a. Succinctly stated, "[t]o award attorney's fees in such a suit to a plaintiff who has succeeded in establishing a cause of action is not to saddle the unsuccessful party with the expenses but to impose them on the class that has benefited from them[.]" *Mills*, 396 U.S. at 396-97.

22

In order to balance what may be the competing interests at play, the Restatement sets forth specific factors to be considered in determining whether the common fund doctrine should be applied in a case where fees and/or costs are sought. First, "[t]he common-fund paradigm involves the creation or preservation of a literal fund: money in the control of the court for distribution to beneficiaries. The claimant requests merely that the fund be charged with the cost of securing it." *Id*. § 29 cmt. e. This is particularly significant where the claimant has no statutory or contractual right to payment, because "[t]he existence of a cash fund plainly eliminates the necessity of requiring [beneficiaries] to pay money for unrequested services." *Id*. In that regard, the requirement that beneficiaries are entitled to a share in the common fund "'by reason of their common or parallel interests therein' establishes the minimum connection between the claimant, the fund, and the defendant, without which the benefits in question are either too generalized or too remote to justify a liability to pay for unrequested services." *Id*.

Second, "[i]n an ideal case for recovery, prior agreement between claimant and defendant will have been impracticable,[14] or the defendant will have been given a

---

[14] In situations where the claimant "has acted defensively, to protect an existing interest in a common fund for the benefit of all interested parties, the ensuing claim in restitution draws upon the additional latitude allowed to persons who take action, without waiting for contract, to protect jointly owned assets against threatened loss." Restitution and Unjust Enrichment § 29 cmt. e.

realistic opportunity to opt out of the transaction." *Id*. This is consistent with this Court's

analysis in *Willim II*, where our refusal to apply a common fund theory of recovery rested

largely on the fact that the individual against whom recovery was sought had "deliberately

elected not to employ an attorney." 155 W. Va. at 14, 180 S.E.2d at 53. More importantly,

it is also consistent with the most fundamental requirement of due process: notice and an

opportunity to be heard.

Third, the court must be satisfied "that a benefit has been conferred that "is

measurably greater than it would have been, in consequence of the claimant's

intervention." Restitution and Unjust Enrichment § 29 cmt. f.  This factor is, at its heart, a

requirement that the benefit – i.e., the common fund from which fees and/or costs are

sought – was created or enhanced by the work of the claimant. Where the benefit to another

is merely incidental to the work done on a client's behalf, the common fund doctrine

typically will not come into play.

Fourth, the court must be satisfied that the claimant "has neither acted

gratuitously nor received full compensation from others."[15] *Id*. § 29(3)(c). This factor is

based in part on

> the general rule by which a person who seeks compensation for
> benefits conferred on another, as the result of a self-interested

---

[15] The universal prohibition against "double-dipping" needs no citation of authority.

course of action that the claimant is free to undertake or decline, must ordinarily found the claim on an agreement with the recipient. . . . The usual result of failure to make a contract – *or to take "no" for an answer* – is that benefits conferred on the defendant will be deemed to be gratuitous, or else "incidental" to the pursuit of the claimant's other objectives.

*Id*. § 29 cmt. g (emphasis added). In this regard, the Restatement notes that "[t]he facts of the decided cases suggest that lawyers, far more often than nonlawyers, seek to recover on a theory of common fund from persons who have attempted to refuse their services[,]" and that "[t]he objections to such a claim are obvious[.]"[16] *Id*. § 29 cmt. b.

---

[16] *But see Felton v. Finley*, 209 P.2d 899 (Idaho 1949). In *Felton*, four of the heirs to a will refused to participate in a will contest brought by the other two heirs, citing a variety of moral and philosophical objections to participating in such a case. *Id*. at 899-90. After the lawsuit was resolved to the benefit of all of the heirs – those who participated in the case as well as those who did not – counsel sought to assert liens against the non-participating heirs for their proportionate shares of attorney fees and costs. The Supreme Court of Idaho upheld the liens, holding that

> The acceptance and receipt by appellants of their share of their enhanced inheritance were entirely voluntary, because there is no law which required them to accept the greater amount; they could have taken only the $500.00 which the will initially gave them and refused the additional sum. Whatever scruples or feelings they had about not signing contracts, taking a dead man's money or interfering with his will, had thus evidently disappeared when the money was made available to them, even though without their active participation. Nevertheless, it was solely through respondent's efforts and successful prosecution of the contest case which procured this additional money for them and which, when thus secured to them by respondent's services, they promptly demanded and have pocketed.

*Id*. at 901.

Upon careful review of the authorities cited *supra*, as well as cases from many other jurisdictions,[17] we find ourselves in agreement with the carefully measured expansion

[17] There is widespread agreement that the common fund doctrine, when applied pursuant to the factors explicated in the Restatement of Restitution and Unjust Enrichment § 29, is an equitable way to allocate the costs of litigation among the beneficiaries thereof. *See, e.g., Hawes v. Colo. Div. of Ins.*, 65 P.3d 1008, 1015 (Colo. 2003) ("The common fund doctrine is an equitable remedy that affords fees to attorneys for their advocacy for the benefit of others. It is grounded in equitable principles of quantum meruit and unjust enrichment."); *Palmer v. Hartford Nat. Bank & Tr. Co.*, 279 A.2d 726, 732 (Conn. 1971) ("There are many reasons why the fund should be made to bear such expenses. The basic theory is that all of the beneficiaries are benefited, yet the expense of that benefit has been borne by less than all. It has been held that in such a situation, the acceptance of the attorney's services by the nonparticipating beneficiaries may be implied.") (citation omitted)); *York Ins. Grp. of Maine v. Van Hall*, 704 A.2d 366, 368 (Me. 1997) ("When an insurance company lays claim to subrogation proceeds, obviously someone has to collect them, and attorneys rarely work for free. It is grossly inequitable to expect an insured, or other claimant, in the process of protecting his own interest, to protect those of the [insurance] company as well and still pay counsel for his labors out of his own pocket, or out of the proceeds of the remaining funds. And this is precisely the view taken by the overwhelming majority of decisions, in that a proportionate share of fees and expenses must be paid by the insurer or may be withheld from its share.") (citing 8A John A. Appleman & Jean Appleman, Insurance Law and Practice § 4903.85, at 335 (1981)); *Hess Const. Co. v. Bd. of Educ. of Prince George's Cnty.*, 669 A.2d 1352, 1358 (Md. 1996) ("The common fund theory has been applied or recognized where all of the holders of mortgage debentures were benefitted by the sale of the security, ordered over the objection of receivers for the debtor corporation, where a stockholder's derivative action benefitted all of the shareholders, where all of the taxpayers of a municipality were benefitted by a taxpayer's action resulting in reimbursement to the municipality of unauthorized disbursements, and where a successful taxpayer's action benefitted all taxpayers of a 'special tax district.'") (citations omitted); *In re Guardianship & Conservatorship of Bloomquist*, 523 N.W.2d 352, 360 (Neb. 1994) ("The policy underlying the common fund doctrine (to avoid unfairness) exists in both a subrogation situation and in a hospital lien situation where the hospital is a creditor with a lien and the patient has no funds to pay. In both situations, the claim or lien will only be paid if the injured party incurs the cost to effectuate a settlement or judgment."); *Rohrich*, 496 N.W.2d at 573 ("In this case, the amount brought into the estate was twice as much as the attorney fees incurred by Joanne. As a result, the value of the estate increased to the benefit of James and Clemens as well as Joanne, so her legal action was not solely for her own benefit. Her actions benefited the estate, for which she should be compensated.") (citation omitted)); *Strawn v. Farmers Ins. Co. of Oregon*, 297 P.3d 439, 444 (Or. 2013) ("the common-fund doctrine permits the

of the common fund doctrine beyond its nineteenth century roots. The American Law Institute's formulation of the common fund doctrine, which synthesizes federal and state authorities and distills the governing principles therein, sets forth a logical and orderly approach to be utilized in determining whether a claimant is entitled to recover fees and costs expended in creating or enhancing a fund that benefits not only parties to litigation but also non-parties whose interests are aligned. Accordingly, this Court adopts the

---

burden of those expenses to be shared among those who benefitted from the litigant's efforts by allowing plaintiff's lawyers to be paid from the common fund created or preserved by the litigation. The doctrine is an equitable one, premised on the theory that those benefitted by the common fund would be unjustly enriched if they did not share in the cost of creating or preserving that fund that would otherwise be borne by the party that pursued the litigation."); *Kline v. Eyrich*, 69 S.W.3d 197, 204 (Tenn. 2002) ("an exception to this rule [parties pay their own attorney fees] arises when the attorney 'has succeeded in securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common.' In such a case, the attorney may oblige the beneficiaries of the fund or property to contribute to his or her fee by assessing that fee directly against the fund or property itself.") (citation omitted)); *Guiel v. Allstate Ins. Co.*, 756 A.2d 777, 781 (Vt. 2000) ("under appropriate circumstances, the common fund doctrine may be applied to require an insurer to pay a proportionate share of the attorney's fees incurred by its insured in obtaining a judgment or settlement that satisfies the insurer's subrogated interest."); *Matsyuk v. State Farm Fire & Cas. Co.*, 272 P.3d 802, 805-06 (Wash. 2012) ("When an insured recovers funds from the at-fault party to which an insurer is entitled to reimbursement, those funds may constitute a common fund. The common fund doctrine provides an exception to the American rule on legal expenses. It applies to cases where litigants preserve or create a common fund for the benefit of others as well as themselves.") (citation omitted)).

persuasive authority of the Restatement (Third) of Restitution and Unjust Enrichment § 29 (Am. Law Inst. 2022), in its entirety, as the law of this State.[18]

Having determined that the Restatement governs questions as to the applicability of the common fund doctrine in a particular case, we easily conclude that the case at bar is one "in which [Counsel's] claim to recover a fee under § 29 presents no theoretical difficulties at all[.]" *Id*. § 29 cmt. b. First, the Unknown Heirs will not have to make a net payment in cash; rather, Counsel's fees and expenses will come from the fund he negotiated on their behalf. Second, the value of each Unknown Heir's share of the common fund exceeds his or her liability to Counsel; indeed, even if Counsel were to be awarded the entirety of the fee he seeks, *see* text *infra*, the Unknown Heirs will be left with a substantial sum of money as a direct result of Counsel's time and effort. Third, Counsel has neither acted gratuitously nor received full compensation from others. Significantly, this was not a case where Counsel refused to take no for an answer; rather, the record reflects that Counsel made diligent efforts to contact the Unknown Heirs but was unsuccessful. Nonetheless, because Counsel was able to identify the Unknown Heirs, he sought to protect their interests by bringing them into the litigation as party defendants, establishing their respective ownership interests in the oil and gas rights to the Andrews Tract, establishing the percentage of royalties, both past and future, to which each was

---

[18] To the extent our precedents can be read to narrow the applicability of the common fund doctrine to a certain class of cases, as the guardian ad litem argues, they are hereby modified.

entitled, and negotiating a settlement in the amount of $2,229,526.72 solely for their benefit. Additionally, although Counsel has been compensated for the work he did for his clients, receiving a percentage fee from the separate settlement he negotiated on their behalf, he has *not* been paid for the work he did on behalf of the Unknown Heirs.

Clearly, Counsel is entitled under the common fund doctrine to "require those beneficiaries for whom [he] is not acting by agreement to contribute to the reasonable and necessary expense of securing the common fund for their benefit, in proportion to their respective interests therein, as necessary to prevent unjust enrichment." Restitution and Unjust Enrichment § 29(2). In this regard, Counsel seeks to be awarded a 1/3 contingency fee and his reasonable expenses for the work he did on behalf of the Unknown Heirs, with all such fees and expenses to be paid from their separate settlement fund. In oral argument before this Court, Counsel argued that a contingency fee award is merited in light of the time and effort he put into this litigation, which began in 2013 and is finally concluding a decade later; however, he candidly conceded, in response to questioning, that the amount of fees and expenses to be awarded is a matter to be decided in the first instance by the circuit court. Accordingly, we will remand this case for the court to consider the parties' submissions and arguments on this issue and to determine a reasonable award of fees and expenses award in light of all of the facts and circumstances of this case.

"The question of what constitutes a reasonable fee – the issue that dominates litigation over attorney's fees in every setting where fees are not set by contract – is one on

29

which the law of restitution offers no detailed guidance." *Id*. § 26 cmt. c. Although we express no opinion as to the reasonableness of the fee award requested by Counsel in this case, we note that the proper methodology for determining fee awards in common fund cases has been the subject of lively debate in federal class action litigation. *See Nilsen v. York Cnty*, 400 F. Supp.2d 266 (D. Me. 2005) (discussing the different federal circuits' varying approaches to fee awards in common fund cases and providing an in-depth analysis of the three major approaches: the lodestar award, either straightforward or with enhancements; the contingency fee award; and the market-mimicking award). State courts have also grappled with the issue of how to award fees from a common fund, with varying results. *See, e.g., Laffitte v. Robert Half Int'l. Inc.*, 376 P.3d 672, 686 (Cal. 2016) ("We join the overwhelming majority of federal and state courts in holding that when class action litigation establishes a monetary fund for the benefit of the class members, and the trial court in its equitable powers awards class counsel a fee out of that fund, the court may determine the amount of a reasonable fee by choosing an appropriate percentage of the fund created. The recognized advantages of the percentage method—including relative ease of calculation, alignment of incentives between counsel and the class, a better approximation of market conditions in a contingency case, and the encouragement it provides counsel to seek an early settlement and avoid unnecessarily prolonging the litigation convince us the percentage method is a valuable tool that should not be denied our trial courts.") (citations omitted)); *Brody v. Hellman*, 167 P.3d 192, 201 (Colo. App. 2007) ("Typically, courts use the percentage method and then crosscheck the adequacy of the resulting fee by applying the lodestar method."); *Kuhnlein v. Dep't of Revenue*, 662 So.

30

2d 309 (Fla. 1995) (rejecting trial court's award of a contingency fee and holding that in its place "a lodestar base would be enhanced, in order to compensate attorney for his contingency risk and in light of substantial benefits achieved, through application of maximum multiplier of five."); *Strawn,* 297 P.3d at 446 ("federal and state courts alike have increasingly returned to the percent-of-fund approach, either endorsing it as the only approach to use, or agreeing that a court should have flexibility to choose between it and a lodestar approach, depending on which method will result in the fairest determination in the circumstances of a particular case.") (citation omitted)).

Although varied, all of the methodologies utilized by courts in common fund cases share a common goal: to fairly compensate the attorney who has achieved a substantial benefit for individuals whose interests are aligned with those of the attorney's clients, taking into consideration the risks assumed in instituting the litigation and the amount and quality of the legal services performed. Because this determination is highly fact-specific, we leave it to be made by the seasoned circuit judge who presided over the instant case.

## IV. Conclusion

For the foregoing reasons, the circuit court's order of July 1, 2021, is reversed, and this case is remanded to the court for determination of a reasonable attorney fee and costs to be paid to Counsel from the settlement he negotiated on behalf of the Unknown Heirs.

Reversed and Remanded